This is Commodores Entertainment v. Thomas McClary and 5th Avenue Entertainment. Good morning. Good morning, your honors. May it please the court, Dorothy Easley on behalf of Thomas McClary, founding member of the Commodores and 5th Avenue Entertainment. We are here today on the granting of judgment as a matter of law on phase one issue of ownership on 54B certification and the granting of a worldwide injunction that precludes Thomas McClary from basically everything of the use of his name in the same sentence with the Commodores. Is that true? Did they really object to the use of that phrase? No, your honor. That phrase has not been presented and that's one of the problems with the injunction order. What I'd like to do is there are three issues that I'd like to address today and that's one of the issues that I'd like to address because these are critical questions and I think your honor is hitting the point. The first issue would be the issue of ownership of the mark. That's critical because the judgment as a matter of law found an abandonment as a matter of law. There's countervailing, contradicting evidence which I'm happy to provide to the court with record sites. I'll get to that. The second issue we'd like to address today for purposes of oral argument is the worldwide injunction and the problems with the worldwide injunction. The third issue we'd like to address today for oral argument purposes is Thomas LaPrade, the indispensable party and the failure to join him and denial of the motion dismissed which is inextricably intertwined with the ownership issue. Before I move to those, addressing your honor's question, I think that this is a case where the forest and not just the trees is extremely important because the whole reason for trademark law, the whole purpose for its existence is not simply to preserve, protect the legacy and the authenticity of the creation but also to protect the rights of the individual owners to that mark. In the case of bans, multiple joint owners. So to address your honor's question, let me take this out of order which is the issue of the worldwide injunction. There are procedural problems with the worldwide injunction and substantive problems with the worldwide injunction. Maybe start with the substantive because I think you said a few minutes ago that the worldwide injunction prohibits the use of Thomas MacLary's name effectively in the same sentence with the word Commodores. That's correct. My understanding was that the injunction actually wouldn't preclude the use of the introduction that you made here, Thomas MacLary, founding member of the Commodores, but would preclude use in a promotional sense. Your honor, actually the injunction, I'm reading the injunction order itself because this is odd in the sense that the judgment as a matter of law took an injunction order that on page 1, footnote 1 states has no factual findings or conclusions of law that have any effect whatsoever on the later trial and yet the judgment as a matter of law without taking any additional evidence reaches back to the injunction order and the judgment as a matter of law says you cannot use the terms the 2014 Commodores, you cannot use the term of Thomas MacLary, the Commodores featuring Thomas MacLary and then leaves wide open the notion of fair use. So it never goes through the bowl of the factors and it can't go through the bowl of the factors because it never takes any evidence. Didn't CEC and its officers unambiguously say they do not object to MacLary billing himself as quote Thomas MacLary, founder of the Commodores and that quote MacLary is free to make fair use of the Commodores' mark to provide historically accurate information about his tenure as a Commodore? Well, Your Honor, yes, they do. Now let me explain why that's problematic. It would be fair and accurate, would it not, to say in response to Judge Newsom's question that both the name MacLary and Commodores could be used in the same label, the same statement, the same effort to disgorge this to the public. Is that not right? No, Your Honor. That's not right when I have it wrong? Well, yes, but respectfully yes, but let me explain why. And maybe I have it wrong and Your Honor's going to tell me why. It could be I'm wrong about it, but I thought they said they don't care if you use the name MacLary in relationship to and describing him specifically as the founder of the Commodores. Here's the fundamental problem. We can't agree on what fair use is. He should be entitled to say the Commodores apostrophe Thomas MacLary. He is a founding member even if he has no longer any rights to the mark. Yes, but your statement was more sweeping than that. Your statement in response to Judge Newsom's question simply put was there was no way the name MacLary and Commodores could appear in the same sentence, the same phrase, the same clause, and in fact they say you can use it in that manner. The problem is we cannot agree on fair use, so that's why I bring it back. Well, they agree that would be fair. They agree that would be fair use. They agree that, and then what if he uses the term the Commodores Thomas MacLary, which is factually accurate, the Commodores founder Thomas MacLary, which is factually accurate? Then what happens? Is he going to be hit with another injunction, a TRO injunction? Is he going to be hit with another injunction? Because they cannot agree on fair use, what does and does not constitute fair use, and at some point we have to get this court to clarify what is fair use, because fair use is that which even assuming he is not a trademark owner, this is why I want to drive this issue forward. So what you'd like this court to do if I have it right? I would like to— Let me ask my question, please. Oh, certainly. I'm sorry. What you'd like this court to do if I have it right is to hypothesize about other possible uses beyond the ones that they said they have no objection to. No, Your Honor. I'm not asking the court to hypothesize. This is a very busy circuit. I think it's the busiest in the nation. What I'm asking the court to do is clarify, as to the injunction, at some point I would like to get to the issue of ownership, because I think there's a fundamental problem in judgment and it's a matter of law, but what I would like the court to do is to give further guidance and clarification on the issue of fair use, because Thomas McCleary is entitled to use— You want us to say, though, if I hear it in substance that fair use would mean the following. If McCleary were to say A, that would be okay. If he alternatively were to say B, that too would be okay, but if he says C, that wouldn't. That's the kind of guidance you're looking for, isn't it? Well, what I'm trying to do is avoid future litigation. Is that the kind of guidance you're looking for? For clarification on fair use, yes, I am. Okay, so why wouldn't that amount to asking us to postulate the possibility that you might want to do that and that wouldn't? It looks to me like you're asking for— If the court would like to indulge in that, the court is free to do so. It looks—please, please let me finish. Certainly, Your Honor. It looks to me what you're asking us to do is to give something that would be very advisory in nature. Maybe I'm misapprehending that. Exactly, that's my concern, so that's why I'm asking the court to clarify fair use. My concern is that, first of all— You understand that we're generally not in the business of giving advisory— Correct. We have enough difficulty deciding— I understand. —cases and controversies when we have real conflict. I understand that. So what I'd like to do is, if I've answered Your Honor's questions— Why? —as to the fair use, what I'd like to do is move to the issue— Sure. —of the other problem with the injunction and then move back to the issue of the ownership. Sure. Because we don't even get to the injunction if the court agrees that this judgment as a matter of law takes an entire body of case law out of the Third Circuit, the Second Circuit, the Ninth Circuit, and rejects that body of case law that recognizes that multiple band owners can own the trademark. It's separate from use. They can't all go out and play the Commodores, but they get to own it. The courts do not divest them of their ownership rights. But before we get there, let me answer the other question which Your Honor raised regarding the injunction, which is the injunction took no evidence at trial. There was no hearing for the permanent injunction. And the injunction did not go through the Boulevard factors, which were more specified in Vanity Fair, in particular the issues of comedy and substantial effect. And this circuit in International Cafe has also adopted the substantial effects standard. So there's no analysis of that, and there's no determination whether Thomas McClary should even be adjoined outside the United States for working the mark. Why do we say that? When we look at cases like Gucci, Juicy Couture out of the Second Circuit, those are district court decisions. When we look at International Cafe, in the case of Juicy Couture, it was a website. In the case of Gucci, it was a defendant that was actually assisting the trademark infringement. So now a panel of this court affirmed on the preliminary injunction. Yes, Your Honor did. And they reached a different conclusion about the extraterritorial obligation. Correct, pursuant to the preliminary injunction standard. Right. So why were they wrong? Admittedly, we certainly are not bound by what they said there because that was simply on a preliminary record. Your Honor. But the position that they took went beyond the fact that it was preliminary in nature and made some more general observations. Why did they get it wrong? Your Honor. Maybe they did. It's not an issue of right or wrong. It's an issue of the record the court has. But they got it right. They got it right, and it's applicable here. You lose on that issue. Your Honor, it was a preliminary record as reflected in the recorded oral argument, and the appellee urged it was a preliminary record with minimal evidence pursuant to affidavits that were never subject to cross-examination. What we presented to this court with detailed, exhausting record sites is to show that there is no support for any notion that there is a substantial effect of Thomas McClary's live performances in Australia in the United States, even though the issue wasn't tried. May I move to the argument of joint ownership? Before you get to that, I just wanted to ask you a little bit. I will give you the time. Don't worry about the time. I'm just looking for your help. Certainly, Your Honor, and I want to do that. There was actual confusion that was experienced in the United States in connection with the New York performance. Doesn't that suggest that it's likely that the use of the marks abroad would create confusion as well abroad? There are three responses to that, Your Honor. First of all, confusion is morphed into the issue of ownership, which brings me to the problem of the judgment as a matter of law. Ownership and confusion are two different things, and those are dealt in the case law by stating that the performers cannot perform under the Commodore's name, whether it's in the United States or overseas, without the permission and consent of the other performers. That's in Marshak v. Treadwell, in Kingsman, in Kasbaum, which is the Steppenwolf decision, in Grondon. That's recognized around the country. So as to that issue of confusion, that's easily remedied by obtaining the consent of the other performers or performing with a qualifier. For example, the Commodore's apostrophe, Thomas McCleary. Now let's address the other component of confusion, which is that confusion overseas, performing before a live audience in Australia, is impossible or close to impossible. Why would I possibly say that? Because in Australia, you have a completely different audience, you have a different exchange, you have different monetary terms, you have an audience that is never going to morph and mingle with the audience in the United States. And in fact, if there is any confusion currently going on, it is the confusion with Orange and King performing currently in the United States, when it's just the two of them. So when people buy these tickets, what they're getting is simply Orange and King performing with other members of a band that are not the original Commodores. They think they're getting the Commodores. With backup recordings, King's holding a guitar, but he's not playing it, he's a trumpeteer. Can I ask a slightly different question? I noted that the Corporation Fifth Avenue filed for a community trademark in the European Union, sort of the equivalent of a federal registered trademark in the United States. As best I could tell, there was no record evidence offered that a community trademark had actually been granted or had been issued by the Office of Harmonization in the Internal Market. Do I have that right? Yes, Your Honor, in the sense that they hold the mark, but there was a pending application for cancellation of the mark. This is outside the record. I would like to answer your questions. No, I'm just asking a simple record question. The record does not reflect whether or not a CTM had been granted or issued or denied by that office yet, correct? Is that correct? It is, but it's procedurally a little bit different, if I can just clarify because I don't want to misstate. The CTM was challenged by CEC, CEC, Commodore, not plural, Entertainment Corporation. That was challenged. That is still in litigation. That has not been resolved. But they originally did have their trademark filed, held the mark. So until it's challenged, as Your Honor appreciates in the United States, trademarks are developed by use, subsequently registration. Outside the United States, they're developed by registration. There are also trademarks that Thomas McCleary holds in New Zealand and Switzerland. But because the issue wasn't litigated, that is the extraterritorial injunction, he wasn't able to present any of that. I think I understand that. Thank you very much. Thank you. You've reserved three minutes for rebuttal. May I address the issue of point ownership? You can certainly eat into the rebuttal time if you'd like. Certainly. Thank you, Your Honor. If you want to go on now, you can. But at this point, you'll be sort of on your dime rather than ours. Let me briefly address one point, and then whatever seconds I have on rebuttal, I'll talk as quickly as I can from eastern North Carolina. On the joint ownership issue, this is critical because in the band context, the law recognizes that multiple band members who are founders of the band make the mark. They cumulatively, jointly, and CEC concedes in its answer brief that they are jointly the owners of the mark. So what we have here, yes, Your Honor, you had a question? I was just going to say, that was very perceptive, by the way. All I did was like flinch and you stopped. That was nice. But, I mean, it seems to me like you've got a flurry of agreements that seem to say that departing, leaving members, leave their rights behind. You've got case law out of the Ninth Circuit in this Roe v. Reed case, which seems effectively on point, which says the same thing. And then the Jurado decision out of this court, not quite on point, but effectively says the same thing. So what's the – sort of how do you stand up against the agreements in the existing case law? Well, that is what CEC relied on, but the agreements say that you have to leave, and that's the fundamental problem. Well, I get it that there might not be an abandonment in sort of the term of art sense, but is there a leaving? No, Your Honor, because the litmus test for departure, Marshak v. Treadwell discusses this, the litmus test for departure is not whether you're standing on stage jointly performing with the band. The question is whether you are continuing to work the mark. And the problem with this is Thomas McCleary, his partnership interests were never cashed out. There is a – what we call the sham. Didn't he, in his own words, split from the band, end quote, in 1984 to pursue his own solo career and doesn't come back in any way, shape, or form for 24 years? No, Your Honor, that is incorrect. Again, that's what CEC says, and I'd like to get the courts and records out. Didn't he say that he split from the band in 1984 to pursue his own solo career? And he does pursue his solo career, as does – You say that in the blue brief. Yeah, he uses the word split, but it doesn't mean that he left the band. His shares for the corporation were not cashed out. There's no evidence of that. His partnership interests, there's no evidence that his partnership interests cashed out, even in 1984 when he purportedly signed a letter saying, I'm leaving the band and never returning. That's what we refer to as the sham Tommy letter. That's deemed forged. But setting the letter aside, I mean, I think Judge Marcus's question is, setting aside the business formalities of his partnership interests and him receiving royalties, what in the real world was he doing with the band in the intervening two decades? In 1984, McCleary continued to earn revenue, performing as one of the Commodores. He attended numerous public events historically. But he would get royalties only on the stuff that he was involved in when he was with the Commodores. He wasn't getting royalties for new recordings that had occurred after he had left. That is not necessary, Your Honor. Herbread makes that very clear. I'm simply asking whether that is accurate as a fact. I'm not asking you to spin the law for me. I'm just asking a simple fact question. Yes, Your Honor, that's correct. He derived no royalties for any songs that might have been composed between 1984 and 2009. Correct. In 1984, he continued to appear on stage with the Commodores. In 1985-86, again, to answer Your Honor's question, Judge Newsom, the Commodores, including McCleary in the state of Ashburn, ended their relationship with Motown and had them audited. He continues to be part of the band at that time. That's DE-380 at 20-21. McCleary has always and still receives his royalties, which Your Honor asked about. That's DE-379 at 190-91, 371 at 84-85. Has he, though, been part of the artistic expression of the band? Yes, he has, and this goes to the issue of joint ownership. That is the critical question because the question of whether you are divested of your rights to the mark, as defined in the Alanimat under 1127, is whether you cease using the mark, use being the commercial use of the mark, not standing on stage always playing with the band, and with the intent never to return. So if I understand the essence of the argument, and help me if I don't have it right, although the member may have left the band and had no further involvement with it for an extensive period of time, the former band member still maintained common law rights to the name for legal reasons. Well, no, Your Honor, because that's a conclusion. I have that wrong. There's a part of your question that's incorrect. Okay, help me with it. Had no involvement with the band. That is not correct. He continued to be with the band. He's not on stage with them, but he was a fill-in guitarist with them. On one occasion in 2009. No, Your Honor, that's not the only one. Is there record evidence that he played with the band between? 1984. After that date. Yes. And before 09. What record evidence is there that he played with the band? Your Honor, he had, McCleary testified that he had played with the band. When? As a fill-in guitarist. When is when? He doesn't give dates, Your Honor, between 1984. You understand why I asked the question? I do understand. I understand that all the dates are not. Because I thought, and again I may misapprehend the record, that he pinch hits and comes in and plays with the band, but that happens in 09 and after 09 as opposed to between 84 and 09. Maybe I've got those facts wrong, and if I do, just point me in the record to where I would get it right. CEC admits as to a specific date that Thomas McCleary appeared with the Commodores as a guitarist in 2010. That's DE380. No, no, no. I understand. I'm sorry. I don't think you're getting my question. I do understand it. I'm trying to answer it. I understand that he appeared with the band subsequent to 09. I'm talking about prior to 09 and after 84, 85. Is there any record evidence that he actually either appeared on stage with the band or participated in creating a new song or something like that? No, Your Honor. As to specific dates, no. Is there testimony supporting that he continued to work the mark as the Commodores and continued to have a relationship with Orange and King? Yes. As to specific dates, that he continued to stand on stage with them? No. Other than the dates that I provided after the resignation letter in 1984, he was still on stage with them. Got it. Thanks very much. Thank you, Your Honor. I appreciate your time. Good morning. May it please the Court? Good morning. I'm Lindsay Lopez, and with me is Dean Kent. We're here on behalf of Commodores Entertainment Corporation, and I want to jump right in to where the Court left off. There is record testimony from Mr. McCleary that between 1985 and 2010, he did not perform with the Commodores, with the active Commodores, which is Mr. King, Mr. Orange, and Mr. Nicholas, who have been continually using the mark since the 80s through today, have been continually touring, have continued to record music, have continued to make all the decisions with respect to the band. They have made the decisions with regard to the hiring, the firing of band members, including bringing Mr. McCleary on for two occasions in 2010 as a fill-in guitar player. They've made all the creative decisions. Did he fill in as a guitar player between 1984 and 2009? No, and his testimony is really unequivocal on that. You can look back at his cross-examination, and he's asked. But he does fill in in 10? In 10. Was that one performance, or was that multiple? There were two performances in 2010. Can I ask you about the ownership question? Because I do think that's messy. The first time this case came to our court, the instructions on remand was that the district court should clarify and address, quote, Yeah, absolutely. And I don't think the district court did that. Again, this is just my effort to hear from you in response to my question. How I read the district court order, he says, basically, the 11th Circuit told me to address this comprehensively, and he just says, you know, there's uncontroverted testimony of King and Orange about the terms of the general partnership agreement. And he says he's, quote, carefully considered the question. I mean, kind of conclusory stuff. I would say, Your Honor, on this record, that a Rule 50 motion was appropriate because of the evidence that was in the record. What the court found is at the time that Mr. King and Mr. Orange transferred the mark, made the assignment of the mark to CEC, they were the only remaining members, and they both testified. Well, let me, so, McCarthy, there's, you know, this dispute about whether he withdrew from the partnership. I mean, he says he didn't. You say he did, right? I mean, that's a dispute, right? I understand that he says that he didn't, but what's undisputed is that he didn't come back. In 1980, he had two performances. But I'm not talking about performing. I'm talking about the legal act of withdrawing from the partnership. I understand that he disputes whether he, there's no dispute about whether he attended any meetings. That's another question that was asked of him. I know he says he didn't leave the band. I don't know that that has any legal significance. But, no, I'm not talking about the performing. I'm talking about withdrew from the partnership. I mean, the district court refers to that as a, quote, tempest in a teapot. But I think, I mean, if he actually was still a member of the partnership, then that would relate to whether or not other members of the partnership could convey the trademark, right? If he was an active member of the partnership, it would have a relationship there. But there was no evidence that he had any continuing relationship with the partnership, that he had meetings, that he showed up for anything at that point. So, in 1984, there was the amended partnership agreement, right? Correct. Okay. And that says that the partnership holds the trademarks pretty clearly, right? I mean, that's what the 84 agreement says. It's actually clearer than the 78 agreement in that regard, right? I think so, yes, Your Honor. Okay. And then it's after that that the, quote, Tommy letter was dated, right? Yes. Okay. Well, I mean, yes. Right, I think that's right. I think really it would be, yes. Okay. So, if it's true that that letter was a sham and that Mr. McCarthy never withdrew from the partnership, then how could two of the partners transfer the entirety of the trademark to CEC? I think it comes down to the issue of whether when he left the band, so when he left the partnership, when he stopped performing. I know. I mean, my question assumes that he did not leave the band. I understand the question, Your Honor, but I don't think that there's any reasonable way to get back to that. I know, but you've got to assume my question for you in order to help me understand. So, I mean, we get, you know, we ask hypotheticals sometimes. So, except for me that he's still in the partnership at the time that King and Orange transfer their trademark to CEC, that would be a problem, right? I mean, they don't have the legal ownership of the entire trademark at that point, right? They would be two of three members at that point at their end that would have the ability to, as a majority, make a decision to transfer them. Oh, so that's your argument. My argument, of course, is that he left the group, that he was no longer there. Right, right, right. And that they were the only remaining members who would have had any ability. He wasn't making any decisions with respect to the partnership. He wasn't making any of the hiring and firing decisions. He wasn't making any actions as a partner of the group. He admits he didn't come to any more meetings. He didn't consult with them on any of these issues. That's his testimony. So can I ask a question? I think I'm getting terms, perhaps terms of art, kind of confused in my own head, and you can sort this out for me. I hear abandonment, withdrawal, leave, split. Do those things mean different things, and is this ownership question in a multi-member band scenario, does it ride on sort of formality or pragmatic considerations about sort of in the real world what happened? I think abandonment is a true term of art. That's the standard that inquires non-use and intent. Right. I think the court can get there on abandonment, but I don't think you can. As a matter of law? As a matter of law, I do. But I don't think that you have to, because I think that there are at least two other concepts that are spelled out in the case law, one that the district court really relied on, which is the Roby versus Reed. It's the same type of concept that's in the Giammarese versus Delphi. Although she, Mrs. Roby, was never the owner of the trademark. Correct, but that's what the court finds. The court finds that when he left, he didn't have anything to transfer to her. Not years later. They said you left the band and you left the marks with the band. So I agree she was never the owner of the trademark, but that's because the assignment could have never been valid. He had nothing when he left, which is the same holding in the Giammarese case about the band Deep Purple. It talks about the band name being partnership property, and so there's no ability for the partner to use it separately. There's no individual right to it. So you don't have to get to non-use and intent not to use in a two-year prima facie evidence. It's just it doesn't belong to you. It belongs to the group. It's sort of an effective walk-away standard. I mean, it's not abandonment as a matter of law. It's something less than that. Is that what you're saying? I don't think you have to get to abandonment as a matter of law. So I think what you're saying is, Judge Newsom, when you talk about abandonment, sort of for purposes of my secondary argument, set that aside, and it can be something less than that. It's leaving or splitting or whatever and not in the real world being part of day-to-day band activities, be it performance or management. Correct. That's what Robey talks about. That's what Robey talks about. Robey talks about the rights to the name belong, in their words, to members who remain continuously involved in the group and are in some position to control the quality of the services being provided. Yes, Your Honor. So that's what Judge Newsom characterized as a real-world answer as opposed to maybe a different juridical answer coming from some other source. So what you have in this case are a series of agreements. We've got to give some meaning to them, and we have some what's conceded by the parties, which is that between X and Y date, he's not involved with the group in the sense of performing with them, participating with them, meeting with them, coming up with ideas for songs, creating songs, recording songs, really doing anything like that. But he says, I was still with the band anyway, notwithstanding the fact that effectively, as a practical matter, on the ground I split the band, split from the band, to use his words. Correct, Your Honor. So his argument is I don't disagree with the real world in the sense that I wasn't there and I didn't do anything. And they were there, and they did do many things. And yes, it was true for almost 25 years, but I still had some legal right because I didn't formally withdraw, notwithstanding what the contract said. What is your response to that? Because that is the argument she's making, if I have it right. I think there's a couple of responses to that. One is if he believes that he has some continuing ownership interest in the partnership or in the corporation, CEC, that's a separate matter. If he believes he should have been bought out or that there should have been some purchase for that, then he could certainly take that up. We would have other defenses to that, but that's not this matter because it's not the matter of whether he has a right to make an independent use separate from the group, his own competing use of the Commodore mark. And you say the contractual language bars him from doing that. I say the contractual language… Among other things. …bars him from doing that. Where in the contractual language is he barred? Tell me specifically. Sure. There are the two separate partnership agreements that the parties entered into looking for the exact language. The first general partnership agreement from 1978 says no individual partner or combination of partners may render any performance or services or sell any product utilizing the partnership name. I'm skipping some language, but without the written consent of all partners. And then that same agreement says upon the death or withdrawal of less than a majority of the partners, the remaining partners shall continue to have the right to use the name. There are several agreements that come after that. None of them change that provision. And then there is a 1984 agreement in total that says, again, upon the death or withdrawal of less than a majority of the partners, the remaining members continue to have the right to use the group name for any purpose. There are two agreements… All five of them? All of them, including Mr. McCleary, yes. And there also is the Motown agreements, which Motown's not a party to this, but they all acknowledged in two separate Motown agreements that they would not use the name separately. Could not use the name. Could not use the name separately. I would not. It wasn't precatory. No. It was mandatory. Absolutely. There's one other question that I wanted to be sure to cover. And it relates to fair use and relates to the scope of the injunction. And Your Honor's correct. We do not have a problem with Mr. McCleary making fair use of the mark. It's difficult to come up with everything. Right, but the point that she makes, and it's an interesting one, is that's fine stated at the highest order of abstraction, but how am I to know you say I can do this, that's fine, but I want to do something a little bit different. How do I know whether I can do that unless you tell me? Well, I don't know. It's impossible for us to predict every. Well, she told you what she wanted to do here. Well, I would say anything that bills him as the Commodores. Could she do what she wanted to do? I say no. Because? That's the Commodores. That's saying you're the Commodores slash you're Thomas McCleary. You can say you're Thomas McCleary, and under classic fair use, which is discussed in McCarran's case, you can say I'm Thomas McCleary, and I can use your mark to describe who I am, which is I'm Thomas McCleary, the founder of the Commodores. So you can say who I am and what my relationship had been with that group. And so the name, the Commodores, can be used in the same statement with his name. You can give accurate factual information, but you cannot use the mark. You cannot say I am the Commodores because that's their mark, and there is actual confusion. There's evidence of actual confusion as a result of him billing himself as the Commodores featuring Thomas McCleary. And just so I'm clear, setting aside your sort of litigation position or your client's representations through you in the brief, I think she was saying earlier that she was reading from the injunction. Would the injunction permit what you and Judge Marcus are discussing? On its face, I'm not sure if it uses exactly which words, but it says you can make classic fair use of the mark under Carran's. But it doesn't explain. It does not. It doesn't. It's fair use. And it would be, I think it would be really difficult to come up with every kind of. . . It would be kind of advisory in nature for us to hypothesize. It would be advisory, and it would be impossible to come up with every iteration that they may want to use and say whether or not that would be appropriate. Let me ask you a different question. In the motion to dismiss, Mr. McCleary claimed that LePred was an indispensable party because he was an original member of the Commodores who had claimed partial ownership of the marks. Is that issue of joinder inextricably intertwined with the permanent injunction? If the answer is no, it seems to me we don't have any jurisdiction to address that now. I don't think it is. I'm trying to think about that for a minute. Right. Presumably it could be. . . You may have jurisdiction over this because this is an issue about whether or not he should have been in front of the court to talk about the relative rights of the parties. But I would say that I don't believe there's any real basis to say that Mr. LePred is an indispensable party. Right. I'm asking a different question. The question I'm asking is not going to the merits of whether Ms. Easley is right or wrong about that, but whether we have the power to entertain it on the front end at this point. I don't think that we do unless we could honestly say it's inextricably intertwined with the injunction, which is plainly improperly before this court, because this case isn't over. Correct, Your Honor. There's a phase two coming up. This is a provisional interlocutory, even though it's the review of a permanent injunction. And she's right. She has every right to be here on that. I'm just asking about the dismissal issue. I would say that I see those issues as very separate. So I would say the court doesn't have jurisdiction to address it. Thank you very much. Ms. Easley, you had used your time, but we'll still give you the three minutes for rebuttal. But we will keep you to three minutes unless we've got questions. Unless we have questions that take you over that. I'd like to give the court some record sites to address Your Honor's questions previously on the issue of performing, which is DE 371 at 123-124. Again, Thomas McClary did not specify dates. DE 379 at 246. Again, not specifying particular dates when he is still performing with the Commodores. But he does not have to perform in the case of Marshack v. Treadwell, and then the subsequent Treadwell USPTO TTAB decision. Those cases concern managers. Benny Ashburn, the manager of the Commodores, also had a trademark in the Commodores' name. You need not be a performer. Roby Reid turns on, and we quote the language. This is why lawyers have to read the full opinions that the judges labor over. What drove Roby v. Reid was not that he walked off the stage. He engaged in a complete cessation. He wasn't even collecting royalties. He's in prison. Once he's incarcerated, he's not touring then. And then he died, and we know he's not performing then. So there was absolutely no continued use of the mark as the Lanham Act defines it. And the Lanham Act talks about commercial use of the mark. So if Thomas McCleary is going off, who developed the signature style, is going off and playing his guitar authentically, and the audience is hearing songs that he co-wrote, co-produced, authentically performing, he is working the mark as the Lanham Act defines it. The other thing, Your Honor asked questions about partnership versus ownership. The partnership agreement, the one that's operative because the previous agreement was subsumed within the GPA in toto because there is an integration clause at the end of the GPA in toto that says this is an entire agreement. 1984 agreement. Yes, Your Honor, that's correct. So in the partnership agreement, the GPA in toto, you had to withdraw by a writing. You didn't withdraw sub silentio. There had to be a writing that's DE 361-1 at 17. In addition, pursuant to that partnership agreement, just like the one before, if McCleary had withdrawn from the partnership agreement, he had to be cashed out. Let me ask you a question about the agreements itself. Going back, let's say, just take, for example, the 79 CEC enters into an exclusive artist production agreement with Motown. Yes, the one ending in 1985. So the 79 agreement itself, and in it, it said, among other things, band members could perform as sidemen for other groups, but in no event could they use the name Commodores in connection with that side engagement. And then it says the members and the group as a whole, quote, would jointly, and not severally, the sole and exclusive owner of all rights in and to the name. This is like the general partnership agreement, but it suggests that they don't have, the ownership was joint and required the continuing involvement with, as opposed to there was some residual right that they may have had, even if they didn't participate with the group for an extended period. That's what I'm sort of getting at with this language. Sure. How are we to read that? And if I may, just to tack on. Certainly. The same agreement, I think, goes on to say that no leaving member will have the right to make any individual use of the name. That's right, Your Honor. But the exact language is, it says, in addition, if one or more members become a leaving member, then the remaining members automatically and without notice would become jointly the sole and exclusive owners of the rights to the name. I think that's what you're referring to. That's right, Your Honor. And my response to that is threefold. First of all, the first agreement to which Your Honor referred, that agreement was no longer in effect because there was a subsequent Motown agreement that became in effect, the 1983 Motown agreement. But this is standard language in contrast because the recording company generally wants to deal with the corporation and they don't want performers going off and performing on their own. But neither of those agreements controlled the partnership when Thomas McCleary entered into the GPA in Toto, which was in 1984. So the Motown agreement gets entered into, the subsequent Motown agreement gets entered into in 1983 and subsumes the previous 1979 Motown agreement. We've got the GPA in Toto that says the partnership holds the agreement. It doesn't say own, but it says holds. So own is pursuant to the law, and the language helps us in the Motown agreement. The joint ownership of these partners, and that's why Marshack v. Treadwell, Kingsman, Steppenwolf, Grondin are all being decided the way they are because we protect the founding members' rights. Whether they're all on stage still performing, they are not divested of their ownership rights and what they created. But what they can't do is they can't all go out and perform separately as Steppenwolf. I think we have it, so if you could just bring it to a conclusion. We'd be much appreciated. Thank you, and I appreciate the court's indulgence. Thank you all for your efforts. This court will be adjourned. Thank you.